CALLAHAN, Circuit Judge,
concurring, in part, and dissenting, in part:
I agree with Part I of the majority’s decision where it concludes that the district court properly denied the intervening parties’ (“Intervenors”) request for declaratory relief and did not abuse its discretion in denying the Intervenors’ request for formal discovery. However, because I would conclude that the district court properly approved the proposed consent decrees, I dissent from Part II of the majority’s decision.
The issue on appeal is whether the district court abused its discretion in approving consent decrees that the State of Arizona entered into with a number of potentially responsible parties (“PRPs”) under the Comprehensive Environmental Response, Compensation, and Liability Act (“CERCLA”), 42 U.S.C. §§ 9601-75. In the process of deciding that question, however, the majority raises and decides— incorrectly in my opinion — a different issue: the degree to which a district court ought to defer to a state’s decision to enter into an early settlement with PRPs under CERCLA. Although the majority recognizes that state agencies may have environmental expertise and be entitled to “some deference” with regard to “environ *1016 mental issues,” it goes on to suggest that the states and their environmental agencies are entitled to no deference in their decisions to enter into early settlements with PRPs. In doing so, the majority fails to recognize the critical role that Congress envisioned for the states under CERCLA and expands the level of scrutiny required for state-sponsored CERCLA settlements. The majority’s decision is inconsistent with the principles that guide our review of consent decrees in general and the decisions of our sister circuits in this context. The decision will ultimately make it more difficult for states to play the role that Congress envisioned for them in remediat-ing the numerous polluted sites that blight our nation. Applying the proper level of deference in this case, I would hold that the district court did not abuse its discretion when it approved the consent decrees.
I
Arizona brought this action seeking remediation costs that it incurred and expected to incur under CERCLA, 42 U.S.C. § 9607(a), and Arizona’s parallel law, the Water Quality Assurance Revolving Fund (“WQARF”), Arizona Revised Statutes § 49-285. As the majority acknowledges, several PRPs approached Arizona early on during its investigation seeking to enter into settlements. Arizona sent early settlement offers to all PRPs. After reaching agreements with some of them, Arizona filed the present action and shortly thereafter, filed a motion seeking approval of the consent decrees.
The district court subsequently ordered Arizona to supplement its motion. Arizona then submitted an affidavit with supporting materials from Ana I. Vargas, an Arizona Department of Environmental Quality (“ADEQ”) chemical engineer. Vargas explained that ADEQ relied on EPA guidelines that allocate responsibility by PRP category (i.e., owner/operator, transporter, generator/arranger). Applying these guidelines, ADEQ reviewed the available information to come up with responsibility allocations for each PRP. For example, owners’ and operators’ allocations were largely based on length of ownership or operation, while generators’ and transporters’ allocations were based primarily on volume. Thus, ADEQ allocated each generator a share of liability based on volume and other factors which was multiplied by 0.60 (corresponding to the 60% allocation for generators/arrangers), which resulted in a final apportionment of liability for the generator. Vargas also provided a breakdown of ADEQ’s $75 million total cost estimate, of which, the settlements totaled $512,000. ADEQ then multiplied each PRP’s share of liability by the cost estimate to arrive at an individualized settlement offer for each PRP. Accordingly, under ADEQ’s formula, each settling defendant paid damages directly corresponding to ADEQ’s estimated apportionment of liability.
The allocations were based upon ADEQ’s review of 800 witness interviews and 100,000 pages of documents and its analysis of “information about the site to determine those areas about which it had no information.” Arizona provided that information to the Intervenors. Although Vargas did not specify how ADEQ arrived at each PRP’s specific allocation or settlement figure, she explained that ADEQ had proceeded in accord with EPA guidelines, which provide that “EPA will not provide a detailed explanation for the results due to the enforcement-sensitive nature of the discussions involved.”
The Intervenors argued that Arizona had not supplied enough information for the court to approve the consent decrees because it had not specified what information it used to arrive at each PRP’s appor *1017 tionment of liability or the cost calculation for each PRP. In its decision approving the consent decrees, the district court observed that courts “give deference to the government’s evaluation of’ proposed consent decrees, citing Arizona ex rel. Woods v. Nucor Corp., 825 F.Supp. 1452, 1456 (D.Ariz.1992), aff'd on other grounds sub nom. Arizona v. Components Inc., 66 F.3d 213, 215 (9th Cir.1995). The court then reviewed the record, and relying heavily on Vargas’s affidavit, determined that Arizona had provided sufficient information for it to evaluate the settlements. The district court noted: “The State’s analysis indicates that, based upon a preliminary estimate of remedial action costs of $75 Million, the range of liability for each settling party extended from 0.01% of the estimated total clean up costs to 0.2%, or as expressed in dollar figures, from $10,000.00 to $150,750.00.” The district court further explained:
The State has informed the Court of the factual bases (files, interviews, documents) for its conclusions. It has explained the methods (software, past costs, estimates) to reach remediation costs. Although the Court agrees with Intervenors that the State has not provided the Court with specific factual details as to each settling party (e.g., witness N of the 800 witnesses stated that settling party X deposited a specified tonnage of a specified type of waste), such in-depth review of the facts and circumstances is not appropriate. . Indeed, although Intervenors argue that such review is needed, Intervenors have not pointed to any controlling precedent that requires such in-depth review.
The district court observed that it was not its “role to determine whether the settlement agreement is the best possible settlement that ADEQ could have achieved, but rather whether it is within the reaches of the public interest.” It concluded that the proposed consent decrees were reasonable and in the best interests of the public.
II
The majority concludes that the district court applied the wrong level of deference to ADEQ’s judgment. It declares that “where state agencies have environmental expertise they are entitled to ‘some deference’ with regard to questions concerning their area of expertise.” However, it then concludes that the district court erred in deferring to ADEQ’s judgment that the agreements were “fair, reasonable, and consistent with CERCLA’s objectives.”[1]
I cannot agree. Congress gave the states a critical role to play in CERCLA enforcement that will be severely undermined by the majority’s decision. Moreover, we defer to the EPA’s decision to settle with PRPs in light of: (a) our recognition of CERCLA’s policy of encouraging settlements; (b) recognition that the settlements are constructed by a party acting *1018 in the public interest; (c) respect for the EPA’s expertise; and (d) respect for an arms-length agreement. These considerations are equally applicable to state environmental agencies, which accordingly are also entitled to significant deference.[2]
A
Congress enacted CERCLA “in response to the serious environmental and health risks posed by industrial pollution.” Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 602, 129 S.Ct. 1870, 173 L.Ed.2d 812 (2009). “The Act was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination.” Id. (internal quotation marks omitted). CERCLA provides a number of powers to the President, who has delegated most of his authority to the EPA, “[t]o ensure the prompt cleanup of hazardous waste sites.” Pakootas v. Teck Cominco Metals, Ltd., 452 F.3d 1066, 1072 & n. 11 (9th Cir.2006).
Although states do not have as large of a role as the EPA does in enforcing CERC-LA, Congress envisioned a crucial role for the states in remediating hazardous waste sites. Most significantly, Congress provided that the various categories of PRPs “shall be liable for” certain remediation costs “incurred by the United States Government or a State or an Indian Tribe.” 42 U.S.C. § 9607(a) (emphasis added); see also Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 120 (2d Cir.2010) (“CERCLA empowers the federal government and the states to initiate comprehensive cleanups and to seek recovery of expenses associated with those cleanups.” (emphasis added)).
Congress also envisioned that states would play a central role by enforcing CERCLA through early settlements. One of CERCLA’s central purposes is to encourage “early settlement between PRPs and environmental regulators.” Anderson Bros., Inc. v. St. Paul Fire & Marine Ins. Co., 729 F.3d 923, 929-30 (9th Cir.2013) (citation and alteration marks omitted). PRPs have a strong incentive “to participate in settlement talks at the earliest possible opportunity because ‘non-settling PRPs may be held jointly and severally liable for the entire amount of response costs minus the amount of the settlement.’ ” Id. at 930 (citation and alteration marks omitted). This is because settlements provide settling parties with protection against contribution actions from other PRPs:
A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.
42 U.S.C. § 9613(f)(2) (emphasis added). Nonetheless, a settling PRP may still seek contribution from non-settling PRPs. § 9613(f)(3)(B). Thus, as the First Circuit has observed: “Congress has ... recognized a special role for states in authorizing judicial approval for consent decrees in which the state is a party, and then authorizing both contribution protection and contribution claims.” City of Bangor v. Citizens Commc’ns Co., 532 F.3d 70, 90 *1019 (1st Cir.2008). States can therefore act independently to definitely resolve a PRP’s CERCLA liability without authorization from the EPA. Niagara Mohawk, 596 F.3d at 127.[3]
Indeed, the EPA itself has recognized that “because of the number and variety of contaminated sites across the country, states play a critical role in effectuating the purposes of CERCLA.” Id. at 126 (alteration marks omitted) (quoting the EPA’s amicus brief). The EPA has elaborated:
When Congress first enacted [CERC-LA] in 1980, it required States to be active partners in conducting Superfund response actions.... CERCLA, as amended, strengthens the partnership between the Federal Government and State and local authorities. State and local governments play an important role in ensuring effective, efficient and well-coordinated cleanups.
EPA, Pub. No. 9375.5-01/FS, State and Local Involvement In the Superfund Program (1989).
As a practical matter, state participation in CERCLA enforcement is absolutely necessary because there are more contaminated sites than the EPA is capable of addressing on its own. As several commentators have explained, under CERC-LA:
the role of the States at national priorities list (NPL) sites ranges from required cost sharing at federally funded cleanups to active site management. A vast number of contaminated sites do not meet the criteria for inclusion on the NPL. For these non-NPL sites the federal government’s role is likely to be limited to site assessment and emergency response or removal activities. For many non-NPL sites, the federal government may not be involved at all. Thus, if any government-supervised activity is to occur at non-NPL sites, States will have to oversee, enforce, or fund cleanups. For these reasons, the role of the States in addressing contaminated sites, independently and in concert with the federal government, has become increasingly important.
Linda K. Breggin, James McElfish & John Pendergrass, State Superfund Programs on Overview of the Environmental Law Institute’s (ELI’S) 1998 Research, Alb. L. Envtl. Outlook, Winter 1999, at 1; see also Caroline N. Broun & James T. O’Reilly, CERCLA Players and Their Roles, in 1 RCRA and Superfund: A Practice Guide § 10:3 (3d ed.2013) (indicating that the states are “key players in Superfund”).
Indeed, there are an estimated 450,000 contaminated sites in the nation. See Ronald G. Aronovsky, A Preemption Paradox: Preserving the Role of State Law in Private Cleanup Cost Disputes, 16 N.Y.U. Envtl. L.J. 225, 232 (2008) (citing S.Rep. No. 107-2, at 15 (2001)) [hereinafter, Preemption Paradox ]. Yet, less than 2,000 sites are fisted on the EPA’s national priorities fist. See U.S. Environmental Protection Agency, National Priorities List (NPL), http://www.epa.gov/superfund/ sites/npl/ (fisting sites as of Feb. 27, 2014). Thus, without state participation, most contaminated sites will remain polluted. Preemption Paradox, supra, at 233 (“The *1020 federal government, through the ... EPA[ ], plays an active regulatory role at only a small percentage of the nation’s contaminated sites. Instead, a state or local government agency serves as the lead regulatory authority at the vast majority of sites.”). Practical considerations also preclude states from proceeding solely under state law. Although many states — like Arizona — have their own parallel laws, settling parties, desiring greater certainty, will insist on CERCLA contribution protection and judicial approval.[4]
B
The seminal decision on CERCLA consent decrees is United States v. Cannons Engineering Corp., 899 F.2d 79 (1st Cir.1990). Drawing on the legislative history of § 9613, the First Circuit concluded that, when evaluating consent decrees, “the trial court’s review function is only to ‘satisfy itself that the settlement is reasonable, fair, and consistent with the purposes that CERCLA is intended to serve.’ ”[5] Id. at 85 (quoting H.R.Rep. No. 99-253, pt. III, at 19 (1985), reprinted in 1986 U.S.C.C.A.N. 3038, 3042). Thus, the First Circuit determined that district courts should evaluate consent decrees according to their fairness, reasonableness, and fidelity to the statute. Id. at 85-90. As that court subsequently observed, these factors are “similar to the one[s] used by courts when reviewing consent decrees generally.” City of Bangor, 532 F.3d at 93. We are in accord. See Turtle Island Restoration Network v. U.S. Dep’t of Commerce, 672 F.3d 1160, 1165 (9th Cir.2012) (“A district court may approve a consent decree when the decree is ‘fair, reasonable and equitable and does not violate the law or public policy.’ ” (citation omitted)).
In Cannons, the First Circuit further observed that:
We approach our task mindful that, on appeal, a district court’s approval of a consent decree in CERCLA litigation is encased in a double layer of swaddling. In the first place, it is the policy of the law to encourage settlements. That policy has particular force where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement. While “the true measure of the deference due depends on the persuasive power of the agency’s proposal and rationale, given whatever practical considerations may impinge and the full panoply of the attendant circumstances,” the district court must *1021 refrain from second-guessing the Executive Branch.
Respect for the agency’s role is heightened in a situation where the cards have been dealt face up and a crew of sophisticated players, with sharply conflicting interests, sit at the table. That so many affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm’s length and advocate its embodiment in a judicial decree, itself deserves weight in the ensuing balance. The relevant standard, after all, is not whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute. Thus, the first layer of insulation implicates the trial court’s deference to the agency’s expertise and to the parties’ agreement. While the district court should not mechanistically rubberstamp the agency’s suggestions, neither should it approach the merits of the contemplated settlement de novo.
899 F.2d at 84 (citations omitted). Thus, the First Circuit’s rationale for deferring to the EPA rested on: (a) CERCLA’s policy of encouraging settlements; (b) its recognition that the settlements are constructed by a government actor committed to protect the public interest; (c) respect for the agency’s expertise; and (d) respect for an arms-length agreement reached by sophisticated parties. The court distilled these factors from decisions discussing judicial approval of consent decrees in a variety of circumstances. See id. (citing cases). The court further explained that the “second layer of swaddling” is the deferential nature of appellate review for a district court’s decision approving a consent decree. Id. We adopted this framework in United States v. Montrose Chemical Corp., 50 F.3d 741, 743, 746 (9th Cir.1995).
C
New courts have been called upon to consider what level of deference district courts should accord to state-sponsored consent decrees. Nonetheless, two of our sister circuits have addressed this issue and provided persuasive guidance. In City of Bangor v. Citizens Communications Co., 532 F.3d 70 (1st Cir.2008), the First Circuit decided to accord “some deference” to the state agency. It explained:
The question becomes what deference, if any, should be given to a state agency which is not charged with implementing CERCLA. We recognize the [Maine Department of Environmental Protection (“DEP”) ] does have a mandate under state law to “prevent, abate and control the pollution of the air, water and land and preserve, improve and prevent diminution of the natural environment of the State.”
Federal courts generally defer to a state agency’s interpretation of those statutes it is charged with enforcing, but not to its interpretation of federal statutes it is not charged with enforcing.
We choose to accord some deference to Maine’s decision to sign onto the Consent Decree, but not the same amount of deference we would accord to the EPA in a consent decree involving the United States. We give deference in recognition that the state agency has some expertise. The lesser deference does not displace the baseline standard of review for abuse of discretion.
Id. at 94 (citations omitted). Arguably, the First Circuit overstated the case when it suggested that states are “not charged with implementing CERCLA,” as they do have substantial roles under the statute as *1022 discussed above. Nonetheless, the First Circuit recognized that state agencies are still due “some deference” when courts evaluate a state environmental agency’s decision to enter into a consent decree.
In Commissioner v. Esso Standard, Oil S.A., 326 F.3d 201, 205 (3d Cir.2003), the district court approved a CERCLA consent decree between the Virgin Islands’ Department of Planning and Natural Resources and several settling PRPs. The Third Circuit affirmed. Id. at 210. In doing so, the court accorded deference to the territorial agency, explaining: “there is deference to the administrative agencies’ input during consent decree negotiations and the law’s policy of encouraging settlement. Where the appropriate agency has reviewed the record and has made a reasonable determination of fault and damages, that determination is owed some deference.” Id. at 207. Thus, although the Third Circuit did not explicitly address how this level of deference differed from the level of deference owed to the EPA, it plainly recognized that the EPA was not a party and still accorded deference to the territorial agency.
We previously had an opportunity to address this issue, but declined to do so. In Arizona ex rel. Woods v. Nucor Corp., 825 F.Supp. 1452, 1459 (D.Ariz.1992), the nonsettling PRPs argued that the district court lacked sufficient technical data to approve the settlement, including information regarding the extent of contamination, cleanup cost, and apportionment of liability. The district court reviewed the information submitted by Arizona (including an affidavit from Vargas) and found that the there was adequate support for the settlement. See id. at 1459-65. Throughout its analysis, the court suggested that it was according ADEQ deference, noting that its role was “not to determine the best method for measuring fault and apportioning liability, but rather to uphold the method proposed by the ADEQ unless it is ‘arbitrary, capricious, and devoid of a rational basis.’ ” Id. at 1459. We affirmed on appeal without discussing the level of deference owed to a state environmental agency, holding that the district court did not abuse its discretion. See Arizona v. Components Inc., 66 F.3d 213, 215 (9th Cir.1995). The most noteworthy aspect of our decision in Components is that we did not do what the majority does here: fault the district court for deferring to ADEQ.
Thus, although we have not specifically addressed the issue, both the First and Third Circuits have accorded at least some deference to state or territorial agencies that entered into CERCLA consent decrees. City of Bangor, 532 F.3d at 94; Esso Standard, 326 F.3d at 207. The Eighth Circuit has also suggested that state agencies are entitled to deference when enforcing federal environmental laws. See Comfort Lake Ass’n, Inc. v. Dresel Contracting, Inc., 138 F.3d 351, 357 (8th Cir.1998) (according “considerable deference” to administrative enforcement agreement between a state agency and a polluter for violations of the federal Clean Water Act). These decisions conflict with the majority’s suggestion that state environmental agencies are entitled to no deference in determining whether an agreement is fair, reasonable, and consistent with CERCLA’s objectives.[6]
Moreover, the factors discussed by the First Circuit in Cannons support extending significant deference to state envi *1023 ronmental agencies. See 899 F.2d at 84. Like the EPA, state environmental agencies possess expertise and are charged with protecting the public interest. Although Congress did not give state agencies as large a role in CERCLA enforcement as the EPA, Congress still contemplated extensive state involvement. Moreover, given the scope of the environmental problems we face as a nation, as a practical matter, state involvement is absolutely necessary. Similarly, CERCLA’s policy of encouraging settlements is not diminished merely because a state entity is involved rather than the federal government. Furthermore, just as EPA-sponsored settlements may result from arms-length agreements reached by sophisticated parties, so may those involving state environmental agencies. Thus, most of the reasons favoring deference to EPA-sponsored settlements also favor deference to state-sponsored settlements.
In any event, the proper level of deference in any given case is not strictly dictated by the identity of the governmental actor involved. As the First Circuit explained in Cannons, even in cases involving the EPA, there is no set level of deference. Rather, the level of deference depends upon the “the persuasive power of the agency’s proposal and rationale, given whatever practical considerations may impinge and the full panoply of the attendant circumstances.” Cannons, 899 F.2d at 84 (citation omitted). Thus, in all cases involving CERCLA consent decrees, there is a spectrum of possible deference that a district court may accord to the decision to settle, depending on the particular circumstances of the case. At its zenith, deference will be highest for well-supported consent decrees involving the EPA. As our sister circuits have acknowledged, however, it does not follow that state agencies are not entitled to deference' concerning their decision to sign on to a consent decree. Accordingly, while the degree of deference may vary depending on the circumstances of the particular case, state-sponsored settlements are entitled to deference when a court assesses a settlement’s fairness, reasonableness, and benefit to the public.
D
As explained above, judicial deference to the EPA in CERCLA consent decrees evolved from the standards courts use when evaluating consent decrees in general. Instead of focusing on the grounds for deference, the majority seems to treat this case as if it presented a statutory interpretation issue. Statutory interpretation is the focus of cases such as United States v. Mead Corp., 538 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Similarly, our opinion in Orthopaedic Hospital v. Belshe, 103 F.3d 1491, 1495-96 (9th Cir.1997), stands for the unremarkable proposition that state agency interpretations of federal statutes that the agencies are not charged with enforcing are not entitled to Chevron deference. But this casé does not turn on a question of statutory interpretation.
Most CERCLA consent decree actions do not present questions about whether the agency’s implementation of a particular statutory provision (or filling of a statutory gap) is entitled to deference. Cf. Mead, 533 U.S. at 229, 121 S.Ct. 2164. Nor do they generally involve an agency regulatory or adjudicatory rulemaking — or even less formal agency policy statements, manuals, or enforcement guidelines— which may have broad implications for *1024 third parties and unrelated controversies. Cf. id. at 233-34, 121 S.Ct. 2164. Instead, most cases involving CERCLA consent decrees focus primarily on whether the agency made a reasonable and fair assessment in a particular case. This is not a question of statutory interpretation, but rather of the exercise of the authority and discretion lodged with the agency. Considerably more so than judges, state environmental agencies are perfectly capable of making those determinations.
One of the factors that we use when evaluating consent decrees is whether they are “consistent with the purposes that CERCLA is intended to serve.” Montrose, 50 F.3d at 743 (citation omitted). In some cases — but not here — applying this factor may present questions of statutory interpretation. In those cases, all other things being equal, a state sponsored-consent decree would be entitled to less deference than an EPA-sponsored consent decree. But most often, determining consistency with CERCLA will only require a rote assessment of whether the decree complies with CERCLA’s well-pronounced goals and is in the public interest.[7] Cf. United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1086 (1st Cir.1994) (indicating that the “overarching goals of CERCLA” include “accountability, the desirability of an unsullied environment, and promptness of response activities” (quoting Cannons, 899 F.2d at 91)). State agencies are equally capable of undertaking this assessment as is the EPA. Thus, a state agency like ADEQ is entitled to some deference concerning its determination that a particular agreement is “fair, reasonable, and consistent with CERC-LA’s objectives.”
Ill
Applying the proper level of deference owed to a state environmental agency, I would hold that the district court did not abuse its discretion in approving the consent decrees here. The majority’s reliance on Montrose to reach the opposite conclusion is misplaced. In Montrose, 50 F.3d at 743, we vacated the district court’s approval of the consent decree and remanded. We explained that the district court had to compare the proportion of projected costs to be paid by the settling defendants with the proportion of liability attributable to them, taking into account “reasonable discounts for litigation risks, time savings, and the like that may be justified.” Id. at 747 (citing Charles George Trucking, 34 F.3d at 1087). The district court had “no evidence at all” upon which to base any assessment of the government’s estimates of responsibility and damage, and thus it could not evaluate the reasonableness and fairness of the decree. Id. at 746-48. In particular, the district court had largely relied on a special master’s assessment of the settlement without independently evaluating the damage estimate. Id. at 746. Thus, we found that the district court had neglected its “obligation to independently ‘scrutinize’ the terms of [the] settlement.”[8] Id. at 747. We accordingly remanded for the district court to:
determine the proportional relationship between the [amount] to be paid by the settling defendants and the govern *1025 ments’ current estimate of total potential damages. The court should evaluate the fairness of that proportional relationship in light of the degree of liability attributable to settling defendants.
Id, at 747 (citing Charles George Trucking, 34 F.3d at 1087). Notably, as the Seventh Circuit recognized, see United States v. George A. Whiting Paper Co., 644 F.3d 368, 373 (7th Cir.2011), Montrose remains the only example of a circuit court reversing a district court’s approval of a CERC-LA consent decree for lack of a factual basis before the majority’s decision in this case.
Here, the record before the district court shows that under ADEQ’s formula, each settling defendant paid damages directly corresponding to ADEQ’s estimated degree of liability. It does not appear that ADEQ provided the settling defendants with any discount for litigation risks or time savings, even though such discounts are permissible under Montrose, 50 F.3d at 747. A settlement corresponding precisely to the settling defendant’s estimated share of liability is necessarily reasonable. See Charles George Trucking, 34 F.3d at 1087 (noting that a settlement was favorable to the government agencies where the payment corresponded to the group’s share of responsibility multiplied by the highest estimate of clean-up costs). Moreover, although ADEQ did not specifically set forth the settlement amount and share for each settling defendant, it did provide the district court with a basis for evaluating its estimates by explaining its methodology in detail and setting out the total value of the settlements and anticipated costs. Requiring ADEQ to list the settlement amounts and share of liability for each settling defendant would be pointless when there is no dispute that the estimate and settlement share are the same. Cf. Cannons, 899 F.2d at 87 (“The logic behind these concepts dictates that settlement terms must be based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each PRP has done.”).
The Intervenors’ arguments here resemble arguments that the First Circuit rejected in Charles George Trucking. In that case, the First Circuit affirmed a settlement even though the appellants contended that the district court had failed to explain the allocation of responsibility either within or among the classes of defendants. 34 F.3d at 1086-88. The First Circuit observed that it is not always possible to explain an allocation of liability in minute detail given an incomplete historical record. Id. at 1088. Although we did not specifically discuss these arguments, we repeatedly cited Charles George Trucking with approval in Montrose, 50 F.3d at 746-47.
The question here is whether the PRPs are entitled to know specifically how ADEQ developed its estimate for the shares of liability attributable to each settling defendant. As the First Circuit explained in Cannons, however, this is an area where the courts will typically defer to the EPA in light of its expertise. 899 F.2d at 87 (“[Wjhat constitutes the best measure of comparative fault at a particular Superfund site under particular factual circumstances should be left largely to the EPA’s expertise.”). Indeed, at an early stage in the process, some of the state’s allocations are necessarily based on qualitative information and expert experience rather than strict quantitative analysis. Accordingly, the district court-property deferred to ADEQ’s choice of measuring comparative fault, which was adequately *1026 explained and supported.[9]
Instead of following our precedents, the majority takes the district court to task for failing to “substantively engage with the parties’ proposed agreements.” The majority requires the district court on remand to wade deep into the abyss of liability, allocation and decide not only whether the settlement amounts are fair and reasonable, but also gauge the accuracy of ADEQ’s allocation against a 100,000 page record and technical guidelines. As a practical matter, requiring a district court to delve into the details of how an agency allocated responsibility within a category of’PRPs based on factual information concerning a variety of measures (e.g., volume, toxicity, etc.) will consume considerable resources and require expertise that most judges do not possess. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 148, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (Breyer, J., concurring) (noting that “judges are not scientists and do not have the scientific training that can facilitate the making of such decisions”). A district court should not have to undertake the equivalent of an expert deposition every time it is asked to approve a state-sponsored CERCLA consent decree.[10]
Here, the Intervenors have not suggested that the information in the record points to some other estimate of the settling defendants’ liability; they simply claim that the record was inadequate. This is insufficient to carry the “heavy-burden” that the Intervenors bear to show that district court’s approval of the consent decree was an abuse of discretion. See Esso Standard, 326 F.3d at 207. It is obvious that the Intervenors are contesting the consent decrees because they do not like the deals they were offered by ADEQ. As is their right, they refused ADEQ’s settlement offers. But they have no right to a settlement offer of their choice. Indeed, the purpose of judicial review is to ensure that proposed settlements further the public interest by holding polluters responsible for the damage that they caused.[11] It is not to guarantee PRPs a good deal.
*1027 The Intervenors’ intent appears to be to hold up fair and reasonable consent decrees with settling PRPs in order to create more leverage in their negotiations with ADEQ.[12] Such delay is not in the public interest. Cf. United States v. Asarco, Inc., 430 F.3d 972, 983 (9th Cir.2005) (noting that the purpose of a consent decree is “to enable parties to avoid the expense and risk of litigation while still obtaining the greater enforceability (compared to an ordinary settlement agreement) that a court judgment provides”). The majority’s approach gives polluters more power in their negotiations with the states and is more likely to push the states to bypass judicial approval and opt for administrative settlements (as they are entitled to do under 42 U.S.C. § 9613(f)(2)), denying the judiciary the opportunity to protect the public interest by ensuring that the states are not cutting sweetheart deals with those polluters.
IV
The majority’s conclusion appears to be founded upon the flawed premise that state environmental agencies entering consent settlements under CERCLA are entitled to no deference concerning their conclusion that a settlement is fair and reasonable. In doing so, the majority fails to appreciate the origins of CERCLA deference. Moreover, the majority vastly and unwisely expands the required level of judicial scrutiny for CERCLA consent decrees. The majority’s decision will significantly restrict state agencies’ ability to enter into early CERCLA consent decrees to the detriment of the environment, the statutory framework envisioned by Congress, and PRPs seeking to resolve their liability early in the process. I respectfully dissent.

. I note that the parties did not raise the level of deference owed to ADEQ as a consequence of it being a state agency before the district court or on appeal. I would hold that the Intervenors forfeited any such argument by failing to raise it in their opening brief. See Avenetti v. Barnhart, 456 F.3d 1122, 1125 (9th Cir.2006) (finding that the Social Security Commissioner waived an argument that deference applies to an administrative law judge’s interpretation of a disability listing by failing to argue it in his opening brief). The majority reaches this issue by proclaiming ipse dixit that it is “inextricably intertwined” with the “correct legal rule.” Curiously, although we were confronted with the same exact scenario in Arizona v. Components, 66 F.3d 213, 215 (9th Cir.1995), we affirmed the district court. What the majority has really done is invented a new legal rule, retroactively evaluated the district court's decision against it, and faulted the district court for failing to anticipate it.

. The importance of this issue is underscored by the fact that the States of Colorado and Nevada filed a letter brief supporting Arizona’s position less than one month after the issue was initially raised.

. CERCLA also provides special roles for states in other contexts, such as allowing them to pursue claims for damages to their natural resources. See § 9607(f). States are also "given a special role in defining allowable costs and cleanup standards.” City of Bangor, 532 F.3d at 91. Specifically, state remediation efforts are presumed to be consistent with the "national contingency plan,” which consists of EPA "procedures for preparing and responding to contaminations.” Id. at 91 & n. 8. CERCLA also gives states the authority to enforce any applicable state or federal standard. Id. at 91 (citing § 9621(e)).

. Compare Consolidated Edison Co. of N.Y., Inc. v. UGI Utilities, Inc., 423 F.3d 90, 95-97 (2d Cir.2005) (concluding that a state law settlement did not affect the settling party's CERCLA liability, and therefore, did not allow the party to seek contribution under CERC-LA), and General Time Corp. v. Bulk Materials, Inc., 826 F.Supp. 471, 475-76 (M.D.Ga.1993) (concluding that a settlement of state law liability did not provide contribution protection under CERCLA), with Ronald G. Aronov-sky, Federalism and CERCLA: Rethinking the Role of Federal Law in Private Cleanup Cost Disputes, 33 Ecology L.Q. 1, 66 n.289 (2006) ("Generally, settlements with some but not all PRPs at a site are difficult to obtain without contribution protection for the settling party; a PRP will be unlikely to settle a cleanup cost lawsuit with the plaintiff only then to be sued for contribution by the non-settling defendants.”).

. As is relevant here, the courts’ judicial review function originates with 42 U.S.C. § 9613(f)(2). CERCLA separately sets forth procedures — including judicial approval — for settlements between the United States and private parties under § 9622, which do not apply here. See City of Bangor, 532 F.3d at 93. Notably, § 9613(f)(2) refers to "an administrative or judicially approved settlement,” indicating that administrative approval is sufficient to provide contribution protection to PRPs settling with state agencies.

. Although the majority indicates that it finds City of Bangor "persuasive," in that case, the First Circuit “accord[ed] some deference to [the state agency’s] decision to sign onto the Consent Decree.” 532 F.3d at 94. The majority proclaims that the district court erred by doing so here.

. Indeed, we, along with our sister circuits, have occasionally formulated this factor as whether the settlement is consistent with “the public interest.” Montrose, 50 F.3d at 747; Esso Standard, 326 F.3d at 206.

. The majority repeatedly suggests that the district court here failed to independently scrutinize the agreements, citing this language. Unlike Montrose, where the district court had relied on the special master almost completely, the district court evaluated the agreements itself in this case.

.Even the majority concedes that ADEQ may have similar expertise to the EPA. Indeed, among other things, ADEQ is statutorily charged with: protecting the environment; protecting the quality of the air and water; abating air and water pollution; restoring , and reclaiming polluted areas; regulating the , storage, handling, and transportation of pollutants; ensuring that state environmental laws and regulations are consistent with corresponding federal laws; and approving remediation levels. Ariz.Rev.Stat. § 49-104. More specifically, as it relates to ADEQ’s work on this case, Vargas averred that she has 23 years of experience at ADEQ and was the same engineer who performed the analysis at issue in Nucor. Notably, when we affirmed in the district court’s decision in Nucor, we took no issue with the district court’s deference to ADEQ. See Components, 66 F.3d at 215.
For recognizing the factual and legal backdrop underlying the district court's decision, the majority accuses me of undertaking a de novo review and usurping the district court's role. Not so. Although I have the benefit of a post hoc perspective that necessarily comes with appellate review (not to mention knowledge of the majority's newly-fashioned legal standards), I have simply evaluated the district court’s reasoning in light of the record as a whole, which we are required to do when reviewing a decision for abuse of discretion. See, e.g., McKinley v. City of Eloy, 705 F.2d 1110, 1117 (9th Cir.1983).

. To the extent that the majority’s opinion merely requires the district court to further explain its findings that are obvious from the record, it is promoting form over substance.

. See United States v. Rohm & Haas Co., 721 F.Supp. 666, 680 (D.N.J.1989) (“The court’s core concern in deciding whether to approve this proposed decree is with ensuring that the decree furthers the public interest as expressed in CERCLA.”); H.R.Rep. No. 99-253, pt. III, at 19 (1985) (indicating that the primary reason for judicial review was to “pro *1027 tect against improper or ‘bad faith’ settlements.”); H.R.Rep. No. 99-253, pt. I, at 59 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2841 (stating that judicial review was intended to guard against "[sjweetheart deals” and ensure that agreements were "in the public interest.”).

. The Intervenors claim that they fear being held jointly and severally liable for the settling parties' shares of liability should those shares exceed the settlement amounts. However, the consent decrees provide that if the settling parties' shares are eventually deemed to be greater than the settlement amount, "the difference shall be deemed an orphan share of liability pursuant to” Arizona Revised Statutes § 49-281(10). Under state law, Arizona is responsible for funding orphan shares. See Ariz.Rev.Stat. § 49-282(E)(2)(e). At oral argument, the Intervenors expressed a fear that the law could change. However, the consent decrees provide that the terms "have the meanings assigned to them under WQARF and CERCLA as of the date this Consent Decree becomes final.”