**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TURTLE ISLAND RESTORATION
NETWORK; CENTER FOR BIOLOGICAL
DIVERSITY; KAHEA: THE HAWAIIAN-
ENVIRONMENTAL ALLIANCE,
            *Plaintiffs-Appellees,*

        v.

UNITED STATES DEPARTMENT OF
COMMERCE; NATIONAL MARINE
FISHERIES SERVICE; GARY LOCKE, in
his official capacity as Secretary
of the Department of Commerce,
            *Defendants-Appellees,*

HAWAII LONGLINE ASSOCIATION,
   *Intervenor-Defendant-Appellant.*

No. 11-15783

D.C. No.
1:09-cv-00598-
DAE-KSC

OPINION

Appeal from the United States District Court
for the District of Hawaii
David A. Ezra, District Judge, Presiding

Argued and Submitted
February 16, 2012—Honolulu, Hawaii

Filed March 14, 2012

Before: Alfred T. Goodwin, Stephen S. Trott, and
Mary H. Murguia, Circuit Judges.

Opinion by Judge Goodwin

## COUNSEL

Jason T. Morgan, Stoel Rives LLP, Seattle, Washington, for the intervenor-defendant-appellant.

Paul H. Achitoff, Earthjustice, Honolulu, Hawaii, for the plaintiffs-appellees.

Jennifer Scheller Neumann, U.S. Department of Justice, Washington, D.C., for the defendants-appellees.

---

## OPINION

GOODWIN, Senior Circuit Judge:

The Hawaii Longline Association appeals the approval of a consent decree entered into by plaintiff environmental groups and defendant federal agencies affecting the regulation and management of the Hawaii shallow-set, swordfish longline fishery. Appellant challenges the district court's vacatur, under the terms of the consent decree, of a regulation increasing the limit on incidental interactions between longline fishing boats and loggerhead turtles and replacing the increased limit with a lower limit that was previously in effect. Appellant argues that the district court abused its discretion in approving a consent decree that violates federal law by allowing the National Marine Fisheries Service to change duly promulgated rules without following the procedural rulemaking requirements of the Magnuson-Stevens Act and the Administrative Procedure Act. We have jurisdiction under 28 U.S.C. § 1292(a)(1), and we affirm.

## I.  *Facts and Procedural Background*

Plaintiff-Appellees, Turtle Island Restoration Network, Center for Biological Diversity, and KAHEA: The Hawaiian-Environmental Alliance (collectively, "Turtle Island"), are nonprofit environmental organizations and corporations. Turtle Island sued the Defendant-Appellees United States Department of Commerce, National Marine Fisheries Service ("NMFS"), and Gary Locke, in his official capacity as Secre-

tary of the Department of Commerce (collectively, the "Federal Agencies"), challenging the implementation of Amendment 18 to the Fishery Management Plan for the Pelagic Fisheries of the Western Pacific Region (the "Final Rule").[1] In relevant part, the Final Rule determines the annual number of allowable interactions between the Hawaii-based shallow-set longline fishery (the "Fishery")[2] and loggerhead and leatherback sea turtles. Turtle Island also challenged the validity of the 2008 Biological Opinion that NMFS prepared to assess the Final Rule's impact on threatened and endangered species and the associated turtle incidental take statement. The Hawaii Longline Association (the "Longliners")[3] was granted permission to intervene as a defendant.

Regulation of the Fishery has been extensively litigated by these same parties over the past decade. *See Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 438 F.3d 937, 940 (9th Cir. 2006). The Final Rule is the latest attempt to modify Fishery regulations. The purpose of the Final Rule was to optimize the Fishery's yield without jeopardizing the continued existence of sea turtles and other protected

---

[1]The Final Rule is codified as 50 C.F.R. § 665.813(b), as amended by 76 Fed. Reg. at 13297-02 (March 11, 2011). The Pelagic Fisheries of the Western Pacific Region include waters surrounding American Samoa, Guam, Hawaii, the Northern Mariana Islands, and the U.S. Pacific remote island area. *See* Western Pacific Regional Fishery Management Council, Pacific Pelagic Fisheries Overview, *available at http://www.wpcouncil .org/pelagic-fisheriestoday.html.*

[2]Hawaii's longline fishing industry fishes mainly for swordfish in the Pacific Ocean. Longline fishing employs a mainline exceeding one nautical mile in length and extending laterally as long as forty nautical miles. Branch lines that terminate with baited hooks are clipped to and extended below the mainline. Longline fishing for swordfish is called shallow-set fishing because the bait is set at depths of 30 to 90 meters, as opposed to tuna-target deep-set fishing in which bait is set at depths of 150 to 400 meters.

[3]The Hawaii Longline Association is an organization that represents the interests of the United States—flagged fishing vessel owners and crew members, as well as associated businesses that participate in the Fishery.

resources. *See* Western Pacific Pelagic Fisheries; Hawaii-Based Shallow-set Longline Fishery; Court Order, 76 Fed. Reg. 13297, 13297 (Mar. 11, 2011) (codified at 50 C.F.R. pt. 665). The Final Rule implementing Amendment 18 changed certain substantive provisions of the 2004 Regulations governing the Fishery. The 2004 Regulations mandated (1) the use of large circle hooks, (2) the use of mackerel-type bait, (3) a limit of 2120 shallow-sets per year, (4) annual turtle incidental take limits of 17 loggerheads and 16 leatherbacks, and (5) 100% observer coverage on every swordfish-vessel fishing trip.

The Final Rule kept the hook, bait, and observer provisions of the 2004 Regulations intact and implemented the following changes: removal of the 2120 set limit and increase of the loggerhead interaction hard cap from 17 to 46.[4] The Final Rule was the result of the rulemaking apparatus authorized by the Magnuson-Stevens Fishery Conservation and Management Act (the "Magnuson Act"). *See* 16 U.S.C. §§ 1851-1856. The Magnuson Act is a comprehensive national program designed to promote and manage domestic commercial fisheries. *See* id. § 1801(b). Congress purported to accomplish these goals, in part, through the development of regional fishery management councils, which propose fishery management plans to regulate fisheries within their region. *Id.* § 1852. The Western Pacific Region at issue here is managed by the Western Pacific Council. *Id.* § 1852(a)(1)(H). The Final Rule was based on a 2008 Biological Opinion by NMFS, which concluded that the increased incidental take limits for turtles complied with the Endangered Species Act.

The Longliners filed a motion for summary judgment on Turtle Island's claims. Turtle Island also moved for partial summary judgment on some of its claims. While those motions were pending, Turtle Island and the Federal Defen-

---

[4]The Final Rule left the limit on leatherback turtle interactions unchanged at 16.

dants began negotiating a settlement. These settlement negotiations resulted in Turtle Island and the Federal Agencies filing a "Joint Motion to Enter Stipulated Injunction as an Order of the Court." The district court characterized this joint motion as "in essence . . . a proposed consent decree that would result in dismissal of all of [Turtle Island's] claims with prejudice."[5] Over the Longliners' objection, and after supplemental briefing, the district court entered an order approving the Consent Decree and denying as moot the Longliners' motion for summary judgment. Under the terms of the Consent Decree, the district court, in relevant part:

- vacated and remanded to the Federal Agencies the portions of the 2008 Biological Opinion and accompanying incidental take statement supporting the increase in allowable loggerhead turtle incidental take;

- vacated and remanded to the Federal Agencies the portions of the Final Rule implementing the increased allowable loggerhead turtle incidental take;

- reinstated the lower incidental loggerhead turtle take limits from the 2004 Biological Opinion and accompanying incidental take statement;

- ordered NMFS to promulgate a new regulation implementing the amount of annual incidental turtle take as set forth in the 2004 Regulations;

- prohibited NMFS from increasing turtle take limits to a number greater than the 2004 limits without first issuing a new Biological Opinion;

---

[5]The parties use different terms in referring to this "Stipulated Injunction." The Longliners call it an injunction, but the Federal Agencies and Turtle Island refer to it as a consent decree. For ease of reference, this opinion uses "Consent Decree."

- ordered NMFS to issue a new Biological Opinion and accompanying incidental turtle take statement for the Fishery within 135 days after making a final determination on its proposed listing of nine distinct population segments of loggerhead turtles as endangered.

The practical effect of the district court's order is not to affect the Final Rule, including removal of the 2120 set limit, except to reduce the incidental take limit for loggerhead turtles back to the pre-existing 2004 limits (a reduction from 46 to 17). The Consent Decree further provided that the reduction was to remain in effect until NMFS issued a new biological opinion and new regulations addressing the take limits. Notably, on September 16, 2011, while this appeal was pending, NMFS uplisted the North Pacific Ocean Distinct Population Segment of loggerhead turtles (the population segment at issue here) as endangered. *See* Determination of Nine Distinct Population Segments of Loggerhead Sea Turtles as Endangered or Threatened, 76 Fed. Reg. 58,868, 58,943 (Sept. 22, 2011) (codified at 50 C.F.R. pts. 223-224). On January 30, 2012, NMFS issued the biological opinion contemplated in the Consent Decree. *See* Biological Opinion, Endangered Species Act—Section 7 Consultation (National Marine Fisheries Service Jan. 30, 2012) *available at* http://www.fpir.noaa.gov/Library/PUBDOCs/biological_opinions/SSLL%202012%20BiOp%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-final%20FOR%20POSTING%20ON%20WEBSITE.pdf. The new biological opinion included an incidental take statement that anticipated annual interactions of up to 34 loggerhead and 26 leatherback turtles. *Id.* at 125.

## II.   *Jurisdiction under 28 U.S.C. § 1292(a)(1)*

The courts of appeals have jurisdiction over "[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions." 28 U.S.C. § 1292(a)(1). The Longliners assert that we have juris-

diction because the Consent Decree is, as the district court labeled it, an injunction.[6] The Federal Agencies agree with the Longliners and also argue that we have jurisdiction. Turtle Island argues against jurisdiction on the grounds that the Consent Decree is a vacatur and remand. *See Eluska v. Andrus*, 587 F.2d 996, 999-1001 (9th Cir. 1978) (holding that orders remanding an action to a federal agency are generally not considered final appealable orders).

"In determining the appealability of an interlocutory order under 28 U.S.C. § 1292(a)(1), we look to its substantial effect rather than its terminology." *Armstrong v. Wilson*, 124 F.3d 1019, 1021 (9th Cir. 1997) (internal quotation marks and citation omitted). That the district court labeled its order an injunction is not dispositive. *See id.* This court treats consent decrees that "prescribe[ ] conduct . . . and compel[ ] compliance" as injunctions. *See Thompson v. Enomoto*, 815 F.2d 1323, 1326 (9th Cir. 1987).

Turtle Island argues that the only injunctive aspect of the Consent Decree is the prohibition against implementing increased turtle take limits absent a new biological opinion and the resultant new rulemaking process. Despite this prohibition, Turtle Island contends that the Consent Decree is not an injunction because it does not compel any specific action beyond those mandated by existing law upon operation of the vacatur and remand. As Turtle Island correctly notes, reinstatement of the 2004 incidental take limit operates as a matter of law under the vacatur, and it would have occurred even if the Consent Decree had remained silent on the subject. *See Paulson v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) ("The effect of invalidating an agency rule is to reinstate the rule previously in force.").

---

[6]The district court's order is titled: "Order: (1) Granting Plaintiffs' and Federal Defendants' Joint Motion to Enter Stipulated Injunction as an Order of the Court; (2) Denying as Moot HLA's Motion for Summary Judgment."

**[1]** In totality, however, the specific provisions of the Consent Decree militate against Turtle Island's argument. Paragraphs five and six prescribe conduct by prohibiting increases to the incidental take limits except through specified procedures, and they further require issuance of a new biological opinion and incidental take statement within a specified time frame. Thus, although the Consent Decree exhibits characteristics of a vacatur and remand, it functions as an injunction by both prohibiting and ordering actions. Therefore, this court has jurisdiction under 28 U.S.C. § 1292(a)(1). *See Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir. 1996) (finding a consent decree to be an injunction); *accord Cal. ex. rel Lockyear v. United States*, 575 F.3d 999, 1019-20 (9th Cir. 2009) (treating a similar order reinstating a prior rule after a vacatur as an injunction).

III.  *The district court did not abuse its discretion in approving the Consent Decree.*

We review a district court's decision to approve a consent decree for an abuse of discretion. *See United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 746 (9th Cir. 1995). Abuse of discretion exists when the district court "fail[ed] to apply the correct law or . . . rest[ed] its decision on a clearly erroneous finding of material fact." *Id.* Conclusions of law are reviewed *de novo*. *Husain v. Olympic Airways*, 316 F.3d 829, 835 (9th Cir. 2002). A finding of fact is clearly erroneous "if it is (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Red Lion Hotels Franchising, Inc. v. MAK, LLC*, 663 F.3d 1080, 1087 (9th Cir. 2011) (internal quotation marks omitted). A district court may approve a consent decree when the decree is "fair, reasonable and equitable and does not violate the law or public policy." *Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990).

The Longliners argue that the district court abused its discretion in approving the consent decree (1) by allowing Turtle

Island and the Federal Agencies to enter a settlement that violates the Magnuson Act and the Administrative Procedures Act ("APA") and (2) by basing its determination that the consent decree is fair, reasonable, and equitable on a clearly erroneous finding of fact that a return to the 2004 incidental take limits will be more protective of loggerhead turtles.

A.   *The Magnuson Act*

The Magnuson Act vests the authority to develop regulations and implement amendments to fishery management plans in the Regional Councils. *See Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 438 F.3d 937, 939 (9th Cir. 2006); 16 U.S.C. § 1853(c)(1) (providing that the Council may submit to the Secretary of Commerce any proposed regulations that it "deems necessary or appropriate" to implement a management plan or amendment). The Longliners argue that the Secretary, or its delegate (here, NMFS)[7] is limited under the Magnuson Act to one of two possible courses of action: (1) approve the proposed regulations and, after a public comment period, publish them as final rules or (2) reject the regulations and resubmit them to the Regional Council for further action. *See* 16 U.S.C. § 1854(b)(1)(A)-(B). The Longliners argue that by entering into the Consent Decree the Federal Agencies deviated from their statutorily prescribed courses of action and engaged in unlawful rulemaking.

**[2]** In support of their position, the Longliners rely principally on *United States v. Carpenter*, 526 F.3d 1237 (9th Cir. 2008), and *Fishing Co. of Alaska, Inc. v. Gutierrez*, 510 F.3d 328 (D.C. Cir. 2007). In *Carpenter*, 526 F.3d at 1241, we held that a court cannot approve a settlement agreement that violates the law. In *Fishing Co.*, the D.C. Circuit invalidated a federal agency's attempt unilaterally to amend a fishery man-

---

[7]*See Natural Res. Def. Council, Inc. v. Evans*, 316 F.3d 904, 906-07 (9th Cir. 2003) (describing the relationship of the various agencies and officials involved in implementing the Magnuson Act).

agement plan by adding additional monitoring and enforcement requirements. 510 F.3d at 332-33. The *Fishing Co.* court held that the Secretary of Commerce violated the Magnuson Act's rulemaking procedures by failing to provide the regional fishery council with the opportunity to deem the additional requirements "necessary or appropriate" to the fishery management plan. *Id.* at 333.

**[3]** The Longliners' coupling of *Carpenter* and *Fishing Co.* is inapposite given the facts of this case. First, neither *Carpenter* nor *Fishing Co.* involved a consent decree. Second, although the Magnuson Act states that NMFS or the Secretary of Commerce cannot alter Fishery regulations proposed by the Regional Councils, *see* 16 U.S.C. §§ 1852-54, that is not what happened here. Unlike the situation in *Fishing Co.*, the government did not seek to make substantive changes to regulations.[8] NMFS merely vacated a portion of a regulation and temporarily reinstated the relevant prior portion to settle litigation via a consent decree. Indeed, as noted above, the Consent Decree does not compel any particular result beyond those mandated by existing law after the vacatur of the Final Rule.

**[4]** Turtle Island and the Federal Agencies argue that the Consent Decree is a judicial act and thus is not subject to the Magnuson Act's rulemaking provisions. They contend that the Magnuson Act's statutory framework, setting out procedures for developing fishery plans, amendments, and regulations, is directed at the Federal Agencies and the Regional Councils, not the courts. The district court adopted this rea-

---

[8]In their reply brief, the Longliners raise for the first time the argument that the Consent Decree implements a "new rule" that is "materially different" from the prior regulations in effect because the Consent Decree removes a downward adjustment provision for incidental turtle take. The Longliners do not fully explain this point, and their citation to the Federal Register, 76 Fed. Reg. at 13298, is devoid of analysis. In any event, "arguments raised for the first time in a reply brief are waived." *See Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (per curiam).

soning in approving the Consent Decree. Because the Consent Decree merely temporarily restores the *status quo ante* pending new agency action and does not promulgate a new substantive rule, however, we need not address the broader issue regarding applicability of statutory rulemaking procedures to judicial acts in general. Our inquiry focuses instead on the narrower question of whether the Magnuson Act should impede the parties' ability to settle litigation in this case.[9]

**[5]** In *Local No. 93 International Association of Firefighters v. City of Cleveland*, 478 U.S. 501, 504 (1986), the Supreme Court addressed whether a consent decree violated a certain statutory provision of Title VII. Because Title VII did not clearly refer to consent decrees, the Court examined the statute's legislative history to determine whether it limited the government's ability to enter a consent decree. *Id.* at 519-20. The Court concluded that the statute did not preclude a consent decree in that case. *Id.* at 521-22. Similarly here, the Magnuson Act is silent regarding applicability of rulemaking provisions to consent decrees. Moreover, the Magnuson Act's legislative history reveals no mention of consent decrees nor any express restriction of the district court's authority to manage litigation regarding the Fishery. Accordingly, we see no reason to limit Turtle Island and the Federal Agencies' ability to determine the course and trajectory of the litigation. *See Carpenter*, 526 F.3d at 1241 (citing 28 U.S.C. §§ 516, 519, which vest the Attorney General, acting through the officers of the Justice Department, with plenary authority to settle litigation in which federal agencies are a party). Settlement is to be encouraged. *See United States v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977) ("We are committed to the rule that the law favors and encourages compromise settlements.").

---

[9]The First Circuit engaged in a similarly tailored analysis in holding that a consent decree did not implicate the Magnuson Act's rulemaking provisions on different facts involving the New England fishery. *See Conservation Law Found. of New England, Inc. v. Franklin*, 989 F.2d 54, 61 (1st Cir. 1993).

Indeed, if the Longliners' position is carried to its logical conclusion, then any attempt by federal agencies to settle litigation involving a regulation would entail a return to the same rulemaking process by which the regulation was created—a proposition that contradicts the Supreme Court's policy determination in another context. *See Local No. 93*, 478 U.S. at 524 n.13 (recognizing that a limit on the government's ability to enter a consent decree would make it substantially more difficult to settle Title VII litigation).

**[6]** The fact that the Federal Agencies complied with the Magnuson Act's rulemaking requirements when they issued both the 2009 Final Rule and the 2004 Regulations, *see* 74 Fed. Reg. 65460, 65462 (Dec. 10, 2009); 69 Fed. Reg. 40734, 40734 (July 6, 2004), and that any subsequent regulations incorporating the new biological opinion's findings will be subject to the Magnuson Act's rulemaking procedures further supports upholding the validity of the Consent Decree.

## B.    *The Administrative Procedure Act*

The Longliners argue that the Consent Decree violates the APA for essentially the same reasons discussed in the Magnuson Act analysis above, but the Longliners tailor these arguments to the procedures specified in the APA. The APA requires periods for public notice and comment prior to federal agency rulemaking. *See* 5 U.S.C. § 553(b)-(c). The APA defines rulemaking as "formulating, amending, or repealing a rule." *Id.* § 551(5). The Longliners argue that the Consent Decree violates the APA's notice and comment requirements because the APA provides no mechanism for the Federal Agencies to repeal the Final Rule through the Consent Decree without engaging in public notice and comment.

In *Consumer Energy Council of America v. Federal Energy Regulatory Commission*, 673 F.2d 425 (D.C. Cir. 1982), a case relied on heavily by the Longliners, the court held that a federal agency was required to follow the APA's notice and

comment requirements before repealing an agency rule governing incremental pricing policies for natural gas. *Id.* at 433, 446. The court reasoned that notice and comment prior to repeal is important to "ensure[ ] that an agency will not undo all that it accomplished through its rulemaking without giving all parties an opportunity to comment on the wisdom of repeal." *Id.* at 446.

The Longliners allege that the Consent Decree caused the same "undoing" without meaningful comment of all that the Final Rule accomplished. *Consumer Energy Council* is distinguishable from this case, however. In *Consumer Energy Council*, the concerns motivating the agency's decision to repeal the rule were different from those raised during the original rulemaking and no party affected by the pricing policy rule suggested repeal. *Id.* Here, the concerns compelling Turtle Island to seek repeal of the Final Rule, namely sea turtle safety, are the same as they were during the initial rulemaking. Moreover, the Consent Decree was the result of an arms-length negotiation between Turtle Island and the Federal Agencies, plaintiff and defendant in the underlying action. The Longliners do not argue to the contrary.

The Longliners contend that the district court used the Consent Decree impermissibly to modify substantive regulatory rules. *See Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States*, 384 F.3d 721, 728 (9th Cir. 2004) ("[T]he APA does not empower the district court to . . . order the agency to reach a particular result."). This argument fails for the same reasons discussed above. Specifically, the Consent Decree vacates only a portion of the Final Rule and the supporting 2008 Biological Opinion and incidental take statements, thus restoring the 2004 regulations during the remand and reconsideration process. The Consent Decree leaves NMFS free on remand to fashion a new rule based on the new biological opinion without imposing any substantive requirements on its terms.

The Longliners also allege that the Consent Decree violates the APA by vacating and revising the 2008 biological opinion and incidental turtle take statement without a proper factual predicate. The Longliners argue that the Federal Agencies should revisit a duly promulgated regulation like the Final Rule only where "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(b). The Longliners allege that the district court thus abused its discretion in "rubber stamping" the Consent Decree as fair, reasonable, and adequate in the absence of an express statement of new information supporting the decision to reconsider the turtle take limits.

Section 402.16 does not support the Longliners' conclusion. Section 402.16 establishes triggers that require reinitiation of the consultation process, but it does not prohibit voluntary reconsideration of regulations. In relevant part, § 402.16 states, "Reinitiation of formal consultation is *required* and shall be requested by the Federal agency or by the Service . . . (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered . . . ." (emphasis added).

In *Montrose Chemical Corp. of California*, this court vacated the approval of a consent decree because it found "no evidence on this record from which the district court could have made any determination" with respect to the factual basis underlying a settlement term. 50 F.3d at 746-47. Here, however, the district court determined that, in light of the underlying statutory objectives to "conserve endangered and threatened species and their ecosystems," the Consent Decree reasonably reduced the incidental take limits temporarily while the NMFS determined whether to change the legal status of loggerhead turtles from threatened to endangered. The potential status change (now enacted) provided a sufficient factual basis for revision of the 2008 Biological Opinion.

**[7]** In sum, the district court did not err in holding that neither the Magnuson Act nor the APA barred implementation of the Consent Decree in this case.

C. *The factual finding that a return to the 2004 incidental take limits are more protective of loggerhead turtles was not clearly erroneous.*

The district court found that the Consent Decree "is more protective of loggerhead sea turtles because it reduces the total number of permissible interactions from forty-six per year to seventeen." The Longliners argue that this finding is clearly erroneous on two grounds. First, because the evidence before the district court revealed that an increased take would be "statistically and biologically insignificant" to the loggerhead turtle populations as a whole. Second, because the increased limits would actually benefit turtle populations because of "market transfer effects."[10]

**[8]** We find no clear error regarding the "more protective" finding because a reduction in the actual number of incidental take, even if statistically insignificant, is still a logical basis for the finding that turtles would be more protected. *Cf. Montrose Chem. Corp.*, 50 F.3d at 746 (describing the deference given to district court factual findings during a review of consent decrees in the CERCLA context). Additionally, the 2008 Biological Opinion found the market transfer effects argument "too speculative to be persuasive." Therefore, the district court did not clearly err in disregarding market transfer effects in evaluating the Consent Decree.

---

[10]Market transfer effects occur when swordfish buyers seek to fill their orders from unregulated foreign fishing vessels as opposed to the more regulated Longliners. This "market transfer" results in more incidental take and a net adverse impact to turtle populations.

IV.  *Conclusion*

Because the Consent Decree is injunctive in nature, this court has jurisdiction under 28 U.S.C. § 1292(a)(1). The Consent Decree does not purport to make substantive changes to the Fishery regulations, so the rulemaking provisions of the Magnuson Act and the APA do not apply. The district court did not clearly err in finding that a return to lower incidental take limits is more protective of loggerhead turtles.

AFFIRMED.