**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SIERRA CLUB; NATURAL RESOURCES DEFENSE COUNCIL, *Plaintiffs-Appellees*, <br><br> v. <br><br> STATE OF NORTH DAKOTA; STATE OF ARIZONA; COMMONWEALTH OF KENTUCKY, Energy and Environment Cabinet; STATE OF NEVADA; STATE OF LOUISIANA, Department of Environmental Quality; STATE OF TEXAS, *Intervenor-Plaintiffs-Appellants*, <br><br> v. <br><br> SCOTT PRUITT, in his official capacity as Administrator of the United States Environmental Protection Agency, *Defendant-Appellee*. | No. 15-15894 <br><br> D.C. No. 3:13-cv-03953-SI <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Susan Illston, District Judge, Presiding

Argued and Submitted March 16, 2017
San Francisco, California

Filed August 28, 2017

Before:  J. Clifford Wallace, M. Margaret McKeown,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge McKeown;
Dissent by Judge Wallace

---

## SUMMARY[*]

---

### Clean Air Act / Consent Decree

The panel affirmed the district court's approval of a
Consent Decree between the Environmental Protection
Agency ("EPA") and the Sierra Club that set a schedule for
the EPA to promulgate designations whether geographic
areas met national ambient air quality standards for sulfur
dioxide under the Clean Air Act.

The Consent Decree settlement provided that so long as
the EPA followed the agreed-upon designation schedule, the
Sierra Club would not move forward with its suit under the
citizen-suit provision of the Clean Air Act.  The settlement

---

[*] This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

did not modify the EPA's statutory authority, nor did it affect or bind the several states that intervened in the suit and objected to the settlement.

The panel rejected the States' three main objections to the Consent Decree: that the Decree improperly disposed of their claims; that the Decree imposed duties and obligations on the States without their consent; and that the Decree was not "fair, adequate and reasonable" because its deadlines far exceeded the Clean Air Act's three-year period to promulgate designations.

Judge Wallace dissented because he disagreed with the majority's holding that the consent decree's seven-year extension of a deadline imposed by the Clean Air Act for the EPA to fulfill a mandatory statutory duty did not conflict with the Act. Judge Wallace would vacate the district court's judgment and remand for further proceedings

---

**COUNSEL**

Paul M. Seby (argued), Special Assistant Attorney General for the State of North Dakota, Greenberg Traurig LLP, Denver, Colorado; Wayne Stenehjem, Attorney General; Margaret I. Olson, Assistant Attorney General; Office of the Attorney General, Bismarck, North Dakota; Mark Brnovich, Arizona Attorney General; Monique K. Coady, Assistant Attorney General; Office of the Attorney General, Phoenix, Arizona; C. Michael Haines, Executive Director; Jacquelyn A. Quarles, Staff Attorney; Office of General Counsel, Energy and Environment Cabinet, Frankfort, Kentucky; Spencer B. Bowman, Legal Division, Louisiana Department of Environmental Quality, Baton Rouge, Louisiana; Adam Paul Laxalt, Attorney General; Belinda A. Suwe, Deputy

Attorney General; Office of the Attorney General, Carson City, Nevada; Ken Paxton, Attorney General; Charles E. Roy, First Assistant Attorney General; James E. Davis, Deputy Attorney General for Civil Litigation; Jon Niermann, Chief, Environmental Protection Division; Nancy Olinger, Assistant Attorney General; Office of the Attorney General, Austin, Texas; for State Intervenor-Plaintiffs-Appellants.

Zachary M. Fabish (argued), Sierra Club Environmental Law Program, Washington, D.C.; Paul R. Cort, Earthjustice, San Francisco, California; Nicholas Morales and David S. Baron, Earthjustice, Washington, D.C.; for Plaintiffs-Appellees Sierra Club and Natural Resources Defense Council.

J. David Gunter II (argued) and Martha C. Mann, Attorneys; John C. Cruden, Assistant Attorney General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Michael Thrift, Office of General Counsel, United States Environmental Protection Agency, Washington, D.C.; for Defendant-Appellee.

**OPINION**

McKEOWN, Circuit Judge:

Under the Clean Air Act ("the Act"), the Environmental Protection Agency ("EPA") must establish and periodically revise national ambient air quality standards ("NAAQS"). After NAAQS are promulgated, the agency designates whether geographic areas meet those NAAQS. At issue in this appeal are the NAAQS designations for sulfur dioxide, a pollutant that causes environmental harm and health risks.

When the EPA missed the statutory deadline to issue its designations, the Sierra Club sued to force agency action. The EPA and the Sierra Club ultimately resolved their claims through a Consent Decree that set a schedule for the EPA to promulgate designations. After a detailed hearing, consideration of objections, and publication of the proposed Consent Decree in the Federal Register, the district court approved the settlement as "fair, adequate and reasonable."

Although styled as a Consent Decree, the settlement between the EPA and the plaintiffs, the Sierra Club and the Natural Resources Defense Council (collectively, the "Sierra Club"), can best be described as a standstill, or non-suit, agreement: so long as the EPA follows the agreed-upon designation schedule, the Sierra Club will not move forward with its suit. The agreement does not modify the EPA's statutory obligations, nor does it affect or bind the several states (the "States") that intervened in the suit and objected to the settlement. The States may pursue a parallel lawsuit that some of them previously initiated in North Dakota or otherwise advance their claims elsewhere. We affirm the district court's approval of the Consent Decree.

## Background

The Act is intended "to protect and enhance" the country's air resources "to promote the public health and welfare and the [nation's] productive capacity," which it seeks to accomplish by allocating implementation and enforcement activities between the federal and state governments. 42 U.S.C. § 7401. One of the Act's provisions aimed at reducing air pollution requires the EPA to set NAAQS that relate to the permissible ambient concentration of certain pollutants considered harmful to public health and the environment. *Id.* §§ 7408–7410. Each state has the primary responsibility for ensuring that the air

quality within its boundaries meets and remains within the NAAQS for each pollutant. *Id.* § 7407(a).

The EPA is directed to review the NAAQS every five years and revise them as appropriate. *Id.* § 7409(d). Within one year of the EPA's promulgation of revised NAAQS for a pollutant, each state must submit recommended designations for areas within the state. *Id.* § 7407(d)(1)(A). A region may be given one of three designations: (1) "attainment," for areas that meet the NAAQS; (2) "nonattainment," for areas that do not meet the NAAQS; or (3) "unclassifiable," for areas that "cannot be classified on the basis of available information as meeting or not meeting the [NAAQS]." *Id.*

What happens next is the genesis of the dispute before us. After the states submit recommended designations, the EPA must promulgate the designations of all regions "as expeditiously as practicable, but in no case later than 2 years from the date of promulgation" of the revised NAAQS. *Id.* § 7407(d)(1)(B). Congress provides a limited extension for "up to one year" when the agency "has insufficient information to promulgate the designations." *Id.*

In June 2010, the EPA revised the primary NAAQS for sulfur dioxide, a gas emitted chiefly when combusting fossil fuels and high-sulfur-containing fuels. Although the precise details of the revised NAAQS are not important for our purposes, this revision caused unique challenges for the collection of relevant emissions data.

Within the year, the States[1] complied with their obligations and recommended designations for the revised NAAQS.  In August 2012, in part because data collection challenges stemming from the revised NAAQS resulted in insufficient data, the EPA opted for the one-year statutory extension to June 2013.  *See id.* § 7407(d)(1)(B).  The EPA also began consulting with stakeholders about the best way to address the data challenges posed by the revised NAAQS, which eventually culminated in the EPA's promulgation of the Data Requirements Rule.  *See* Data Requirements Rule for the 2010 1-Hour Sulfur Dioxide ($SO_2$) Primary National Ambient Air Quality Standard (NAAQS) ("Data Requirements Rule"), 80 Fed. Reg. 51,052 (Aug. 21, 2015) (to be codified at 40 C.F.R. pt. 51).  However, by August 2013—after the EPA's deadline had expired—the agency had designated only 29 areas, leaving undesignated more than 3,000 counties throughout the country.

In August 2013, the Sierra Club sued the EPA in the Northern District of California under the Act's citizen-suit provision, 42 U.S.C. § 7604(a)(2), seeking to compel the EPA to issue designations.  Shortly after, the States moved to intervene, asserting that their "claims against [the] EPA will address [the] EPA's failure to promulgate [sulfur dioxide] NAAQS attainment designations in the time frame mandated by the [Act]" and that they "have a significant protectable interest in the terms of any remedial order or settlement that might result from th[e Sierra Club's] case." Nevada, North Dakota, South Dakota, and Texas had

---

[1] The states in this appeal are Arizona, Kentucky, Nevada, North Dakota, Louisiana, and Texas.  North Carolina filed a complaint-in-intervention, but it is not a party to this appeal.  As discussed in note 2, North Carolina is now pursuing a separate action against the EPA for its failure to promulgate sulfur dioxide designations.

previously filed their own citizen suit in the District Court of North Dakota seeking the same relief, and that suit was stayed pending the resolution of the case in California.

A month after the States asked to join the California suit, the Sierra Club moved for summary judgment in an effort to speed up the EPA's publication of designations. The EPA acknowledged that it missed the three-year deadline. With no dispute on liability, the district court granted the Sierra Club's summary judgment motion. The court also granted the States' motion to intervene.

The district court ordered the parties to confer on an appropriate remedy. The parties briefed proposed remedies and engaged in multiple settlement discussions over several months, including at least ten joint settlement conferences. Although efforts to reach a global resolution among the EPA, the Sierra Club, and the States failed, the Sierra Club and the EPA agreed to a settlement that the States declined to join. Under that settlement, the EPA must roll out designations in three phases, with the final promulgation of designations no later than December 31, 2020—more than seven years after the June 2013 deadline set by the Act's framework in 42 U.S.C. § 7407(d)(1)(B).

The Sierra Club and the EPA submitted a proposed Consent Decree to the district court and published the Consent Decree in the Federal Register for notice and comment. Proposed Consent Decree, Clean Air Act Citizen Suit, 79 Fed. Reg. 31,325 (June 2, 2014). More than one hundred comments—including some by the States that are intervenors here—were submitted in response to the proposed Consent Decree. After a hearing in which the States participated, the court entered the Consent Decree over the States' objection. Significantly, the court saw no

barrier to the States pursuing relief or claims in other actions regarding the EPA's tardy designations.

On appeal, the States raise three main objections to the Consent Decree.  They argue that the Consent Decree improperly disposes of their claims, imposes duties and obligations on the States without their consent, and is not "fair, adequate and reasonable" because its deadlines far exceed the Act's three-year period to promulgate designations.

**Analysis**

Our analysis of the Consent Decree is framed by the Supreme Court's teaching in *Local No. 93, International Association of Firefighters v. City of Cleveland* ("*Local No. 93*"), 478 U.S. 501 (1986).  In a discrimination suit brought by minority firefighters against the City of Cleveland, the union representing most of the city's firefighters intervened and objected to the settlement.  The Supreme Court explained that the consent decree was properly entered over the objections because "one party—whether an original party, a party that was joined later, *or an intervenor*— c[annot] preclude other parties from settling their own disputes and thereby withdrawing from the litigation." *Id.* at 528–29 (emphasis added); *see also id.* at 504–06; *United States v. Carpenter*, 526 F.3d 1237, 1240 (9th Cir. 2008) ("We recognize that the intervenors whose claims are not the subject of a settlement cannot veto that settlement.").  Thus, an intervenor must be heard on whether to approve a consent decree, but it cannot stop other litigants from resolving their dispute by withholding its consent to a decree. *Local No. 93*, 478 U.S. at 529.

In other words, the States cannot block the Consent Decree between the Sierra Club and the EPA simply because

they disagree with its terms. The Supreme Court adopted this approach for good reason; otherwise, one party could hold the other parties hostage in ongoing litigation, and a global settlement or judgment would be the only option. The rule is especially applicable here because the States were part of the hearing on the proposed Consent Decree; briefed the proposed remedy; publicly commented on the proposed Consent Decree, which was published in the Federal Register; and participated in multiple settlement conferences. The notion that the Consent Decree breezed through without the States' input or due consideration by the district court is belied by the record. The district court's thoughtful and detailed order addresses the very issues the States raise on appeal. *See* Order Granting Joint Motion to Approve and Enter Consent Decree and Denying Other Motions as Moot, *Sierra Club v. McCarthy*, No. 13-cv-03953-SI (N.D. Cal. Mar. 2, 2015), ECF No. 162.

That said, it is well-established that "[a] court's approval of a consent decree between some of the parties . . . cannot dispose of the valid claims of nonconsenting intervenors." *Local No. 93*, 478 U.S. at 529; *E.E.O.C. v. Pan Am. World Airways, Inc.*, 897 F.2d 1499, 1506 (9th Cir. 1990) ("It is fundamental to our notions of due process that a consent decree cannot prejudice the rights of a third party who fails to consent to it.").

The Consent Decree leaves the States' claims intact. By its very terms, the Consent Decree does not dispose of or prejudice the States' independent claims. Nowhere in the Consent Decree are the States' claims or grievances identified or even referenced. To the extent that the Consent Decree asserts that the Sierra Club and the EPA "have agreed to a settlement of this action" or that the Consent Decree is "an adequate and equitable resolution of all the claims in this

matter," that language refers only to the action and claims between the Sierra Club and the EPA.  Additionally, the Consent Decree does not limit the EPA's rights in lawsuits against third parties: "[n]othing in the terms of this Consent Decree shall be construed to waive any remedies or defenses the parties may have" under the Act, and nothing in the Consent Decree attempts to circumscribe the rights of the States or other third parties against the EPA.  Importantly, the district court recognized that the Consent Decree had no bearing on the States' claims, noting that "those [States] will still be free to pursue earlier deadlines in [other] actions."[2]

Recognizing that the Consent Decree does not actually extinguish their claims, the States shift gears slightly to assert that the Consent Decree impermissibly saddles them with legal duties or obligations.  Were that true, the States might have a winning argument, as a consent decree "may not impose duties or obligations on a third party, without that party's consent."  *Local No. 93*, 478 U.S. at 529; *United States v. Oregon*, 913 F.2d 576, 582 n.4 (9th Cir. 1990).  However, as the States ultimately acknowledge, the Consent Decree does not subject them to any explicit obligations: it does not mandate any specific state action, and only the Sierra Club and the EPA can be held in contempt for failure to comply with the Consent Decree's terms.  *See Local No. 93*, 478 U.S. at 529–30.

The States' argument can best be read as a claim that the Consent Decree forces indirect duties and obligations on

---

[2] As to North Carolina, the district court noted that the Consent Decree "provides North Carolina with the relief sought, namely a binding schedule to issue all remaining designations."  Notwithstanding this observation, North Carolina is currently litigating its claims against the EPA in the Eastern District of North Carolina.  *North Carolina v. McCarthy*, 5:13-cv-00710-FL (E.D.N.C. filed Oct. 9, 2013).

them.  This tack also fails because a careful look at the briefing reveals that the States' objection is with the obligations imposed by the Data Requirements Rule, not the Consent Decree.  Indeed, the Data Requirements Rule, which was promulgated under agency rulemaking procedures including notice and comment, requires the States to submit specific data reporting under the revised NAAQS.  *See* Data Requirements Rule, 80 Fed. Reg. at 51,064.

Although the Consent Decree references the Data Requirements Rule, it does not impose any of that rule's substantive obligations on the States.  That is, the Consent Decree cannot and does not "permanently and substantially amend[] an agency rule that would have otherwise been subject to statutory rulemaking procedures." *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1187 (9th Cir. 2013). Instead, the terms of the Consent Decree operate independently: the Consent Decree's deadlines would remain in effect even if the Data Requirements Rule had not been promulgated, and the Data Requirements Rule would still obligate the States to submit additional emissions data in absence of the Consent Decree.  The States cannot use the Consent Decree to launch a backdoor challenge against this duly promulgated agency rule.

In the end, what the States really take issue with is that the EPA blew the deadline to promulgate NAAQS designations and that the deadlines outlined in the Consent Decree are not "fair, adequate and reasonable." *See Oregon*, 913 F.2d at 580.  That failure to comply with the statutorily prescribed timeline—and the EPA's continued failure to remedy the problem—has left the States in their alleged planning purgatory.  But it is not the Consent Decree that inflicts this "regulatory limbo."  The Consent Decree merely

gives the latest dates—vis-à-vis the agreement with the Sierra Club—for the EPA to promulgate the designations. The settlement between the Sierra Club and the EPA is not the reason behind the States' waiting game.

As a practical matter, had the EPA met the deadlines, there would not be a lawsuit over the deadlines or a need to establish a new baseline for compliance. The Act does not prescribe a remedy for default, and, as the district court observed, "the appropriate remedy in a 'deadline' case such as this is to require [the] EPA to issue designations pursuant to a schedule, not to mandate that [the] EPA issue any particular designation." Rather than impose a particular substantive outcome, the district court approved a consent decree that simply compels action by the EPA. *See Brock v. Pierce Cty.*, 476 U.S. 253, 260 & n.7 (1986); *Sierra Club v. EPA*, 762 F.3d 971, 981 & n.5 (9th Cir. 2014). The EPA is no stranger to consent decrees that set deadlines after it fails to timely promulgate designations. *See, e.g.*, *Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 158 (D.C. Cir. 2015) (per curiam) (enforcing a consent decree's deadlines and noting that "[t]he EPA entered into the consent decree precisely to settle allegations that it had *already* missed the Act's statutory deadlines for promulgating the 2008 ozone NAAQS designations"); *Nat. Res. Def. Council v. EPA*, 777 F.3d 456, 461–63, 467 (D.C. Cir. 2014) ("EPA entered into consent decrees aimed to enforce those provisions [related to the promulgation of designations] under which it agreed to promulgate revised NAAQS by March 2008 and to issue designations by May 2012."). The district court did not abuse its broad authority in concluding that the Consent Decree "is fair and reasonable, both procedurally and substantively, and consistent with the Clear Air Act, and other applicable law." *See Oregon*, 913 F.2d at 580; *Alaska Ctr. for Env't v. Browner*, 20 F.3d 981, 986–87 (9th Cir.

1994) (highlighting a district court's "broad latitude" to fashion equitable relief).

Nothing can put the genie back in the bottle now that the EPA has missed the promulgation deadline, but the Consent Decree leaves the States free to pursue their claims in other litigation and to argue for even shorter timelines for agency action.    In its order, the district court reiterated the representation by the Sierra Club and the EPA that "[a]ny decision by this Court to enter the proposed consent decree would not, in and of itself, result in the dismissal of the Plaintiff-Intervenors' claims in those suits.  That is, if the Court enters the proposed consent decree here, those parties will still be free to pursue earlier deadlines in those actions . . . ."  At oral argument, the States acknowledged that they could pursue their pending claims in the North Dakota litigation.  And North Carolina, which is not a party to this appeal, is already pursuing its claims in federal court in North Carolina.  Put simply, the States cannot have it both ways:  they cannot try block the Consent Decree by arguing that it improperly disposes of their claims while simultaneously asserting that they can pursue those claims in another forum such as the district court in North Dakota.

In sum, as long as the EPA sticks to the schedule in the Consent Decree, the Sierra Club will not advance its lawsuit against the EPA.  The Consent Decree does not prohibit the EPA from promulgating designations prior to those deadlines, nor does it otherwise constrain the agency's discretion.  The States may have a complaint against the EPA for failure to adhere to the Act's schedule for promulgating the designations for sulfur dioxide NAAQS, but they cannot legitimately claim that the terms of the Consent Decree, as opposed to the EPA itself, are to blame for their predicament.  Because the Consent Decree "does

not bind [the States] to do or not to do anything," "imposes no legal duties or obligations on th[em] at all," and "does not purport to resolve any claims the[y] might have," the States cannot block the Consent Decree merely by withholding their consent. *See Local No. 93* 478 U.S. at 529–30.

**AFFIRMED.**

---

WALLACE, Circuit Judge, dissenting:

The majority affirms the district court's judgment, entered in the form of a consent decree, permitting a seven-year extension of a deadline imposed by the Clean Air Act (Act) for the Environmental Protection Agency (EPA or Agency) to fulfill a mandatory statutory duty. In so doing, the majority holds that this extension, which allows the Agency to collect additional data before carrying out its statutory duty, does not conflict with the Act. I disagree, and therefore respectfully dissent.

## I.

When reviewing a consent decree, we employ an abuse of discretion standard. *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1185 (9th Cir. 2013). "Abuse of discretion means that a decision rests on a clearly erroneous finding of material fact or is the result of a failure to apply the correct law." *Id.* (internal quotation marks omitted), *quoting Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1165 (9th Cir. 2012). Correspondingly, we review the district court's conclusions of law de novo. *Id.*

II.

Although our review of the entry of a consent decree is deferential, the decree must meet certain baseline requirements to merit our approval. "Before approving a consent decree, a district court must be satisfied that it is at least fundamentally fair, adequate and reasonable. In addition, because it is a form of judgment, a consent decree must conform to applicable laws." *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990) (internal citation omitted). The majority acknowledges this latter requirement, but its opinion contains virtually no analysis of the decree's compliance with the Act. This omission makes all the difference—as I explain below, the decree in fact conflicts with the Act and therefore fails to "conform to applicable laws." *Id.* Accordingly, I would vacate the judgment and remand for further proceedings. *See Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 526 (1986) (stating that parties to a consent decree may not "agree to take action that conflicts with or violates the statute upon which the complaint was based"); *Conservation Nw.*, 715 F.3d at 1185 ("[A] district court may not approve a consent decree that 'conflicts with or violates' an applicable statute." (quoting *Local 93*, 478 U.S. at 526)).

A.

The majority opinion ably outlines the Act's requirements with respect to the issuance of national ambient air quality standards (NAAQS) and designations of compliance (or lack thereof) with such standards. To summarize briefly, the Act obliges the EPA to promulgate NAAQS with respect to airborne pollutants. 42 U.S.C. § 7409(a). Within two years of promulgating or revising a NAAQS, the Agency must designate every air quality control region within the country as not meeting the standard

("nonattainment"), meeting the standard ("attainment"), or not capable of designation "on the basis of available information" ("unclassifiable"). *Id.* § 7407(d)(1)(A)(i)–(iii), 7407(d)(1)(B)(i). This designation period may be extended for up to one additional year if the EPA Administrator "has insufficient information to promulgate the designations." *Id.* § 7407(d)(1)(B)(i). Once an air quality control region has been designated, the Agency may redesignate it if "available information indicates that the designation of any area or portion of an area within the State or interstate area should be revised." *Id.* § 7407(d)(3)(A)–(C).

The EPA revised its sulfur dioxide NAAQS in 2010, thereby triggering its obligation to issue area designations within the statutory timeframe. But even after taking the full three years available to it, including the one-year extension allowed by the Act, the EPA issued designations for just twenty-nine regions, thus leaving most of the country undesignated. The EPA attempted to explain this decision by stating that it was "not yet prepared to issue designations" for the remaining regions and promising to do so "in separate future actions." As the EPA admitted in the district court, its withholding of those designations constituted a failure to discharge a non-discretionary statutory duty. In short, the EPA failed to do what the legislature charged it to do with no real reason for its rejection of the congressional direction.

The consent decree seeks to remedy this failure by effectively rewriting the statute with a series of staggered deadlines for completing designations that extends until December 31, 2020—seven years after the congressional statutory cut-off date. These deadlines appear to have been chosen without congressional approval to enable or at least permit the EPA to obtain additional information for making initial designations. This includes data that the States are

now required to collect pursuant to a new regulation—the Data Requirements Rule (Rule)—that imposes more stringent information-gathering obligations than previously were applicable. In its order accepting the party-drafted decree, the district court observed that the States likely would have to "supplement and update their previous submissions" if the Rule were adopted. The consent decree bears this out, describing the Rule's purpose as "direct[ing] states to conduct additional information collection and analyses . . . for purposes of informing future area designations under the 2010 revised . . . [sulfur dioxide] NAAQS." It is thus clear that the parties agreed to the consent decree, and the district court approved it, on the understanding that the EPA would use the extra time to collect additional data for making its initial designations. Absent from this "amendment" was the approval of Congress, which passed the statutory requirements being modified.

## B.

District courts have "broad latitude in fashioning equitable relief when necessary to remedy an established wrong," such as a federal agency's failure to take required action. *Alaska Ctr. for Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994). We have held that this latitude even permits a court faced with such procrastination to effectively amend the statute by establishing "deadlines that are far more lenient than those contained within the [statute] itself." *Id.*

At least for now, this is the framework we must use to review the district court's approval of the consent decree. Before proceeding further, however, I want to register my strenuous disagreement with this unfortunate rule. It thrusts courts into a quasi-legislative role for which they are poorly equipped. Although it is impossible to compel an agency's

compliance with a statutory deadline once it has passed, and a court must take *some* action to remedy the failure, it does not follow that the proper course of action is for the court to assume the legislative mantle and effectively rewrite the agency's statutory obligations. As an institution, we lack the considerable investigative resources and deliberative capacity available to Congress when it crafts statutes like the Act to govern agency action. We therefore should be hesitant to jettison the legislature's considered judgment regarding issues like the one before us. While we frequently chant the importance of separation of powers to protect the judiciary, this rule seems to say there is no breach when we invade the legislative branch.

Nor is the possibility of undermining congressional intent under such a rule limited to the courts. Agencies themselves can evade the "especially heavy" burden to justify departing from "a statutory command," *Ala. Power Co. v. Costle*, 636 F.2d 323, 359–50 (D.C. Cir. 1979), merely by disregarding their deadlines, since they can count on the courts to impose new deadlines—and sometimes "far more lenient" ones—that necessarily post-date the ones contained in relevant statutes. *See Browner*, 20 F.3d at 986. It would be far better for us to refrain from such legislative ventures and limit our role to ordering agencies to comply with their statutory duties as early as practicable, and if they cannot, they should return to the legislature for a solution.

C.

Nonetheless, we cannot, as a panel, overrule our precedent. Nor need we to resolve this case, for the consent decree does not merely set deadlines "far more lenient than those contained within the [statute] itself." *Id.* As explained, the consent decree in effect authorizes the EPA to collect additional data before issuing its initial designations; indeed,

the decree's deadlines are predicated on the assumption that that is how the Agency will use the additional time. The Act, however, forbids such additional data-gathering when it comes at the expense of timely designations. The parties were powerless to dispense with this proscription, and the district court lacked authority to approve their agreement to do so.

Three of the Act's provisions, taken together, reflect Congress's intent to restrict the EPA's data-gathering authority in the situation before us, where the Agency desires to collect more data before making initial designations. The first is the one-year extension available to the EPA Administrator when the Agency lacks the necessary information to make initial designations after two years. The second relevant provision is the unclassifiable designation category, which is meant to fill the gap when the information available to the Agency does not support either an attainment or nonattainment designation. The third provision is the redesignation process, which allows the EPA to revise its initial designations as the data warrant.

1.

Regarding the extension provision, the Act requires the EPA to issue designations within two years of promulgating or revising a NAAQS, but permits the Agency to extend that deadline "for up to one year in the event the Administrator has insufficient information to promulgate the designations." 42 U.S.C. § 7407(d)(1)(B)(i). The Act provides for no further extensions. In this provision, then, Congress anticipated the EPA's desire to delay designations specifically for the purpose of collecting additional data, and determined that it would cap the Agency's ability to do so at one extra year. Thus, Congress specifically intended that the EPA only be able to collect a maximum of three years' worth

of data before making initial designations. Permitting the Agency to gather data for up to seven additional years, as the consent decree does, therefore frustrates Congress's intent. *Cf. Sierra Club v. EPA*, 294 F.3d 155, 160 (D.C. Cir. 2002) ("We cannot but infer from the presence of . . . specific exemptions that the absence of any other exemption . . . was deliberate, and that the Agency's attempt to grant such a dispensation is contrary to the intent of the Congress.").

2.

The second pertinent provision, the unclassifiable designation category, buttresses this reading. An unclassifiable designation is appropriate for "any area that cannot be classified on the basis of available information." 42 U.S.C. § 7407(d)(1)(A)(iii). Such a designation presupposes that the EPA may not be able to collect sufficient data to make a designation of attainment or nonattainment within the statutorily designated time limit, and any area not so designated is unclassifiable at that time. It also implies that the Agency's data-gathering authority is temporally limited. If it were not, then there would be no need for the unclassifiable designation—the Agency could simply delay making designations indefinitely until it obtained enough information to designate all areas as attainment or nonattainment. The inclusion of the unclassifiable designation therefore makes sense only if Congress understood the Act to require the EPA to make initial designations, at least in some cases, before the Agency finished gathering all of the data needed to make attainment or nonattainment designations. Allowing the Agency to withhold its designations until it gathers the necessary data to make one of those designations would render the unclassifiable designation provision superfluous. The Agency's interpretation of these designations thus makes no

sense and is unnecessary for carrying out its statutory responsibility.

This is not to say that the consent decree in fact authorizes the EPA to delay its initial designations until it has collected sufficient information to designate all areas as attainment or nonattainment. It is possible that the Agency may have to designate some areas as unclassifiable even at the end of the decree's generous timeline. But that does not mean that the decree is consistent with the Act. By granting the Agency up to seven extra years to make initial designations, the decree adds a fourth option, which appears nowhere in the statute, to the list of actions the EPA may take at the conclusion of the Act's three-year information-gathering period: withhold. Instead of performing its mandatory duty to designate all areas with one of the three labels, the EPA instead may simply refuse and continue to collect data, contrary to Congress's intent, until whatever future deadline a court may see fit to impose. The consent decree itself, of course, does not demand such an outcome because it applies only in this case. But we can approve the consent decree only by holding that the Act allows for such an expansion of the Agency's data-gathering authority, and that holding certainly will control the outcome of future cases.

3.

The third provision germane to this issue is the redesignation process, which authorizes the EPA to redesignate an area when the information available to the Agency indicates that a new designation is warranted. *Id.* § 7407(d)(3)(A)–(C). Like the unclassifiable designation, the inclusion of this provision makes sense only if the Act sets a hard deadline for making initial designations even when the Agency would prefer to collect additional data. The

redesignation process acts as an escape hatch to mitigate the otherwise undesirable consequences of requiring initial designations before all the relevant data are gathered. Without redesignation, the EPA would be either stuck with its initial designations or forced to promulgate another NAAQS and start the designation process over if subsequent data brought the initial designations into question. But with redesignation, the EPA can both meet the statutory deadline for making initial designations and ensure that its designations at all times reflect the most current data available. If the Act allowed the EPA to continue collecting data without making an initial designation until it was satisfied that its research was complete, the redesignation option would be of little or no practical value.

### D.

Read together, these provisions clarify Congress's intent with respect to situations—like this one—where the EPA wishes to delay designations so that it can collect additional relevant information. Congress determined that the Agency should be able to gather data for a maximum of three years before making initial designations. If the Agency lacks sufficient information to designate areas as attainment or nonattainment at the end of those three years, it should make use of the unclassifiable designation for such areas. Once it issues initial designations, the Agency can then continue to gather information and redesignate areas as the data warrant. The EPA's delay in this case, and the consent decree's extended deadlines premised on the assumption that the Agency will continue to gather data in the interim, frustrate this purpose by greatly enlarging the time in which the Agency can collect information without ever making an initial designation.

The interpretation I suggest is consistent with both the Act's goal "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare," *id.* § 7401(b)(1), and its character as "an exercise in cooperative federalism." *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 240 (D.C. Cir. 2013); *see also Gen. Motors Corp. v. United States*, 496 U.S. 530, 532 (1990) (describing the Act as "a comprehensive national program that made the States and the Federal Government partners in the struggle against air pollution"). As the Intervenor-Appellants point out, this process provides "regulatory certainty" by creating a defined timeframe for receiving designations, which impose certain obligations on states in crafting their implementation plans. *See* 42 U.S.C. §§ 7407(a), 7502. At the same time, it affords the EPA the means to ensure its designations are based on the most up-to-date information available. Approving the consent decree, and thus blessing similar future extensions by district courts confronting agency intransigence, runs roughshod over the states' interests in favor of vindicating the EPA's desire to depart from the rules Congress has mandated for it. If the Act's three-year data-collection timeframe is inadequate, the Agency's remedy lies with the legislature, not the courts.

III.

The EPA argues that the consent decree is consistent with *Sierra Club v. EPA*, 762 F.3d 971 (9th Cir. 2014), where we held that the Agency's failure to issue a power plant operation permit timely did not exempt it from applying the most updated air quality standards, which had gone into effect after the missed deadline, when it finally issued the permit. *Id.* at 983. In so concluding, we relied on the "basic principle that EPA is bound to enforce administrative guidelines in effect when it takes final

action." *Id.* at 980. Taken at face value, this principle would require the Agency to abide by the now-operative Rule's requirements in issuing its designations.

*Sierra Club* is distinguishable because applying the applicable guidelines in that case was consistent with the Act's requirements, whereas postponing the designations here so that the EPA can collect more data conflicts with the Act. But even if this aspect of *Sierra Club* extends to the situation before us, nothing in the Rule actually forces the Agency to delay the making of one of the three initial designations while it collects the data that the Rule calls for. *See* 40 C.F.R. §§ 51.1200–.1205. The Rule requires neither that the EPA gather additional data before making the designations nor that it withhold those designations until the deadlines established in the consent decree. Consequently, the Agency's obligation to enforce the Rule, such as it is, does not demand the outcome imposed by the consent decree.

The two cases cited for the proposition that the EPA is "no stranger" to consent decrees like the one before us likewise are unhelpful to the majority's analysis. In *Mississippi Commission on Environmental Quality v. EPA*, 790 F.3d 138 (D.C. Cir. 2015), to which Sierra Club was a party, the D.C. Circuit reviewed the Agency's *refusal* to delay its designations to gather more data, even though it previously had entered into a consent decree that permitted it to do so. *Id.* at 158. The court sided with the EPA, observing that the Agency would have "infringe[d] the Act's deadlines still further" had it delayed as Sierra Club was urging. *Id.* If anything, then, *Mississippi Commission* acknowledged that prolonging a delay in issuing overdue designations to collect additional data conflicts with the Act.

*Natural Resources Defense Council v. EPA*, 777 F.3d 456 (D.C. Cir. 2014), fares no better. There, the D.C. Circuit merely recognized that, as part of a different case, the Agency had entered into a consent decree requiring it to issue designations within four years of promulgating a revised NAAQS; the court did not review that decree or hold that it complied with the Act. *See id.* at 462–63, 467; *see also* Air Quality Designations for the 2008 Ozone National Ambient Air Quality Standards, 77 Fed. Reg. 30,088, 30,091 (May 21, 2012) (identifying the case in which the consent decree was entered). Although it appears that the Agency permitted states to update their submissions during the fourth year, and thus obtained additional data before making initial designations, 77 Fed. Reg. at 30,091, neither the consent decree nor the act of collecting additional data was subject to appellate review. Accordingly, *Natural Resources Defense Council* does not support the proposition that extending the EPA's initial designation deadline so it can gather more data is consistent with the Act.

Nor does the majority's characterization of the decree as a "non-suit agreement" redeem it. It is not clear exactly what role this characterization of the consent decree plays in the majority's analysis. To the extent the majority is trying to distinguish this consent decree from others, all consent decrees operate in the same way. It is always the case that one or more parties refrains from pressing its claims as long as the other party (or parties) abides by the terms of the consent decree. The decree in our case is not unique in that sense.

What the majority appears to be employing is a "no harm, no foul" rationale—because the effect of the consent decree is only to halt Sierra Club's and Natural Resources Defense Council's (NRDC) claims against the EPA while

leaving intact the Intervenor-Appellants' claims, the decree has no consequential legal effect. I do not agree. As explained above, we can affirm the district court's judgment only by holding that the consent decree "conform[s] to applicable laws." *Oregon*, 913 F.2d at 580. There is no exception for decrees that operate as effective non-action agreements. (Such an exception would swallow the rule; as just mentioned, all consent decrees are non-action agreements as the majority uses that term.) Approval of the consent decree therefore has a legal effect of significant consequence: it amounts to a holding that the decree's expansion of the Agency's pre-designation data-collection authority does not conflict with the Act.

I cannot go along with this conclusion. I believe that the consent decree does conflict with the Act by permitting the EPA to delay its initial designations while it collects more data. The separation of powers doctrine forbids our amending the statute—only the Congress can do that. The EPA can return to the legislative branch—but should not be allowed to misuse the judicial branch. The district court's judgment should be vacated and the case remanded for the parties to try again or for the district court to determine an appropriate remedy that complies with all applicable laws.